JOHN ELSTNER *v.* THE CINCINNATI EQUITABLE INSURANCE COMPANY.

1. Where premises insured against loss by fire are described in the application and policy, as a *warehouse*, a warranty is implied that the property shall, during the continuance of the risk, conform to that description;

and any change in its character, voluntarily made or permitted, not of a temporary or accidental character, invalidates the contract.

2. This consequence will not be averted by parol proof that the insurers were notified at the time by the insured of the intention to make the change as afterward made.

3. To authorize a court of equity to reform a policy, on the ground of mistake, there must be clear proof of a mutual mistake, by the omission or insertion of a material stipulation, contrary to the actual agreement and intention of the parties.

4. Where the premises insured were described as a *warehouse*, and were subsequently used as *a candy manufactory*, in which *fire-heat* was necessarily employed, and the policy was issued by a mutual insurance company, whose deed of settlement contained a provision, " that no policy shall be so construed as to extend to any house or shop where any trade or business is carried on that requires the use of fire-heat, unless the same be mentioned in the policy, and a proportionable deposit paid, to be agreed upon with the directors," and by the act of incorporation, the insured becomes a member of the company, subject to all the restrictions of the deed of settlement. Parol proof that at the time the insurance was effected, the insured notified the officers and agents of the company, of the intended use of the premises, who knew that fire-heat would necessarily be used in the manufactory, is not sufficient proof of an agreement for an insurance to cover that contingency, to entitle the insured to a reformation of the policy so as to cover the loss, the premium actually charged and paid being that proportioned only to the ordinary risks upon a warehouse.

SPECIAL TERM.—On motion by plaintiff for a judgment on the verdict and motion by defendant for a new trial.

The facts are sufficiently stated in the decision.

*Tilden, Rairden & Curwen,* for plaintiff.

*Fox & French,* for defendant.

STORER, J. The jury to whom the questions of fact were referred, have returned a general verdict for the plaintiff, and found substantially in the affirmative upon the question specially submitted to them by the court.

The plaintiff asks for judgment, and the defendant moves for a new trial.

Two questions were presented, and very naturally arose upon the pleadings, there being two causes of action stated

in the petition; one upon a policy of insurance, seeking to recover for an alleged loss by fire; the other in the nature of a bill to reform the policy, on the ground that the real contract between the parties is not stated in that instrument.

The policy was issued on the 13th of August, 1853, and insured the plaintiff from loss by fire upon "that certain five-story brick warehouse, situate on the north-west corner of Vine and Commerce streets, 21½ front, by 93 feet in depth; also the adjoining five-story brick warehouse, on the north, being the same width and depth as the first building, each insured in the sum of $2,800. For a particular description, or survey, see Application Book No. 2, folio 11." The survey alluded to was in the following words, which is proved to have been made by the authorized agent of the defendant, whose special duty it was to attend to all applications for insurance.

"Aug. 13, 1853.—John Elstner, a five-story brick warehouse, situate on the north-west corner of Vine street and Cherry alley, 21½ feet front, and 93 feet deep, 21½ feet of cornice, 26 twelve-light windows, 10 by 18, 3 pair of folding-doors, sash and shutters, 4 hatchways, 4 flights rough steps; room on each floor; valued at $4,400; premium 1¾ per cent. Also, adjoining, on the north, a five-story brick warehouse, same width, depth, and same finish as the first; valued at $4,000; premium 1¾ per cent."

On the return of this survey, the policy was made out, and delivered to the plaintiff, who paid the premium. The risk was to be continued for seven years; and it is in evidence the insurance was made at the lowest rates for warehouses, being one-quarter per cent. per annum.

After the insurance was made, the plaintiff's tenant, to whom the last-described building in the survey, as well as the policy, had been rented, took possession, erected furnaces, by which he carried on the manufacture of candy in the cellar second and third stories, using fire-heat in all. While the building was thus used it was consumed by fire.

The plaintiff presented his claim for the loss, which was resisted by the defendant, on the ground that a candy manufactory, which required the use of fire-heat, was not insured by the policy. It was further objected that, by the deed of settlement, which binds all who are insured in the company, and which is made part of the contract of insurance by the policy, in express terms it is stipulated in the tenth article, among other things, " that no policy shall be so construed as to extend to any house or shop where any trade or business is carried on that requires the use of fire-heat, unless the same be mentioned in the policy, and a proportionable deposit paid, to be agreed upon with the directors."

By the act of incorporation, every insurer becomes a member of the company, and is subject to all restriction imposed by the deed of settlement, and entitled to all the privileges it imparts.

The question then arises, does the policy, by a fair construction of its language, cover the building thus used and appropriated?

We lay out of the case, in this view of the plaintiff's claim, the evidence adduced on trial as to the knowledge of the defendant, of the purpose to which the building was applied, and confine ourselves to the consideration of the contract, as it is written and accepted by the parties.

We suppose the property, as described in the policy, is a representation that it will continue to retain that character, in all essential particulars, until the risk terminates, unless the parties stipulate to the contrary. This rule is adopted to secure the underwriter from all perils he could not be supposed to have contemplated when he subscribed the policy, as well as to hold the insured to perfect good faith on his part. Thus it is said, 4 Mass. 330, *Stetson* v. *Mass. Mut. F. Ins. Co.*, that where the extent and nature of the risk depends upon the continuance of the premises in the condition in which they were represented, they can not be altered to the detriment of the insurer, without invalidating the insurance.

It is not, as remarked by Lord Elden, in 3 Dow, 255, 265, *Newcastle Fire Ins. Co.* v. *Macmorran & Co.*, "whether the risk was greater in one building than another—the question for the underwriter is, what is the building, *de facto*, that I have insured?"

So in 3 Coms. 370, *Wall* v. *E. River Ins. Co.*, it was held. that the words *occupied as a storehouse*, must be construed as a warranty, and, as such, they could only be satisfied by proof. of an exclusive occupation.

This case was afterward on trial in the Superior Court of New York, and it was attempted to prove, by parol, that the use of the building insured was, by custom, consistent with the ordinary meaning of the language of the policy; but the application was denied, the court deciding that where a contract contained a warranty that the building was occupied exclusively as a storehouse, the evidence rejected would not tend to prove a compliance with the warranty, while it could not be denied that one-half of it was occupied exclusively for other purposes; 3 Duer. 273.

There is certainly no difference in principle between the case last cited and the present. Here a warehouse is insured only; there a storehouse. The meaning of both is the same—the terms are equivalent. The insured, by accepting the policy, agrees that his property shall, for the future, conform to the description it contains; and the underwriter takes the risk upon the understanding that the subject will not be changed from its original character.

No temporary or accidental use of the premises for a purpose not strictly within the ordinary acceptation of the terms used, would affect the contract. They are but the exceptions to the rule, and prove its universality. But where the occupation is permanent for another purpose, and while thus appropriated the building is destroyed, it necessarily follows that the risk is at an end; the contract on the part of the insured is changed, and the insurer discharged from his liability. 6 Cowen, 673, *Fowler* v. *Ætna Ins. Co.*; 2 Denio, 75, *Jennings* v. *Chenango Co. Mut. Ins. Co.*; 20 Conn. 139, *Billings* v.

*Tolland Co. Mut. Ins. Co.;* 2 Hall, N. Y. 589, *Delonguemare* v. *Tradesman's Ins. Co.;* 3 Com. 122, *O'Neil* v. *Buffalo F. Ins. Co.;* 10 Pick. 535, *Curry* v. *Comm. Ins. Co.;* 26 E. L. and Eq. 238, *Sillem* v. *Thornton.*

By the tenth article of the deed of settlement, to which we have already referred, the insurers are limited in their powers. Certain risks are not to be taken at all, and others may be taken, under special agreement, subject to additional or extra premium.

It is well settled that all the by-laws and conditions, prescribed for the government of mutual insurance companies, become a part of the contract to insure; and each member consents to their full operation whenever he asks to be insured. He then sustains the relation of an underwriter, as well as the party insured, in the premium or deposit he pays; he owns a part of the fund by which he is to be indemnified for future loss to himself, and for which other policy-holders are to be paid. Angell on Ins. §10; 7 Watts & Serg. 348, *Susq. Ins. Co.* v. *Perrine;* 9 Metcalf, 205, *Liscom* v. *Boston Mut. Fire Ins. Co.*

The effect, then, of the article restricting the use of fire-heat, is to prohibit all insurance where that element is employed in the process of, or for the purpose of manufacturing any article of commerce. Such is the clear language of the deed of settlement, and the policy must be controlled by its terms.

It is argued, however, with much force by the counsel for the defendant, that the evidence offered, proved the knowledge, on the part of the underwriter, that the building to be insured was to be used for the purpose of manufacturing candy; and that the fire-heat was an essential instrument in the process of manufacture. The ground thus assumed is not without its equity, and in a proper case would present very strong reasons for interference; but in a case like this, where the effect of admitting the evidence of knowledge would practically be to change or explain by parol, a very clear and significant description in the policy, the rule would

be ignored, which so cautiously guards written agreements from verbal interpolation. To abrogate so important a principle in order to relieve, against possible injury, when there is no ambiguity in the phraseology of the agreement, might introduce consequences more injurious to the administration of the law than the occasional denial of an alleged right.

" The policy itself is considered to be the contract between the parties, and whatever proposals are made, or conversations had between them, prior to the subscription, they are to be considered as waived if not inserted in the policy, or contained in a memorandum annexed to it." 13 Mass. 96, 98, *Higginson* v. *Dall.* See also, 1 Duer on Ins. §16, and note to page 132.

This rule is adopted by the Supreme Court of Ohio, in 18 Ohio, 116, *Harris* v. *Col. Co. Mut. Ins. Co.*, where it is held that parol evidence can not be received to show that in fact the insured or his agent knew the true state of facts.

In the late case, 3 Gray, 583, 589, *Lee* v. *Howard F. Ins. Co.*, the doctrine is very clearly stated by Bigelow, J.; we use his language: " It must be presumed conclusively, that the whole engagement of the parties, and the extent and mode of their undertaking was reduced to writing, and all evidence of a previous *colloquium* is incompetent. This wise and salutary rule can not operate harshly upon parties, who read and understand their written agreements before executing them." See also 7 Cushing, 175, *Barrett* v. *Union Mut. Fire Ins. Co.;* 30 E. L. & Eq. 496, *Loughor C. & R. W. Co.* v. *Williams;* 8 Cushing, 133, *Lowell* v. *Middlesex Mut. F. Ins. Co.*

There has been what would seem to be a partial suspension of the rule, by the courts of Pennsylvania, where the mistake or error of the surveyor has caused the misdescription of the premises insured; but even there, the cases rest upon the fact that the error could have been readily rectified by an examination of the premises as to their structure or size, or the existence of other buildings contiguous. They

do not reach a case where the property itself, once described fully and clearly, can be made to assume a new character, or change the received meaning of terms in common and ordinary use. Moreover, there is no court of equity in Pennsylvania, and the powers of the common law judges, as to the reformation of contracts, is limited.

We have come to the conclusion, therefore, that the action can not be sustained upon the contract as it is embodied in the policy.

II. The second cause of action presents the question, whether the policy contains the contract, as really made and intended by the parties; for if there has been any mistake, error, or omission, we do not doubt but it is our duty to reform the instrument, and remit the plaintiff to all his original rights?

There must, in all such cases, be mutual mistake, by the accidental omission or insertion of a material stipulation, contrary to the intention of the parties. The terms employed in the policy must be such as do not express the true intention and understanding, both of the insured and the underwriter, and a strong case must be made before the court will disregard the language of the contract and give it a new interpretation.

But the mistake must be manifest, and the evidence to prove it, be very clear. 1 Arnold on Ins. 51, 52; 2 Phillips on Ins. §1937. Indeed, it is said that the only well authenticated instance in which the English chancellor has exercised the power to reform a policy, is in 1 Atkyns, 545, *Motteux* v. *London Ass. Co.*, where Lord Hardwicke held that the contract might be corrected by the label or previous memorandum between the parties. The same chancellor refused to interfere, a few years afterward, in 1 Ves. Sen. 317, *Henkle* v. *Royal Exch. Ass. Co.*, regarding the evidence as not sufficient to vary the contract.

In the United States, the power is fully admitted, and in every proper case exercised, by the chancellor. Thus, in 2 Cranch, 419, *Grayes* v. *Boston Mar. Ins. Co.*; 3 Mason, 6, *Andrews* v. *Essex Fire & Mar. Ins. Co.*; 2 Johns. Ch. 631,

*Lyman* v. *United Ins. Co.;* 1 Washington C. C. 419, *Hogan* v. *Delaware Ins. Co.;* 1 Paige, 278, *Phœnix F. Ins. Co.* v. *Gurnee;* 3 B. Mon. 231, *Franklin F. Ins. Co.* v. *Hewitt, et al.;* 18 Ohio, 116, *Harris* v. *Col. Co. Mut. Ins. Co.;* Ib. 459, *Suydam* v. *Col. Ins. Co.*

The cases we have referred to, without exception, demand from the party asking the chancellor to interfere, the clearest evidence of his right; if there is any reasonable doubt as to the agreement, any misunderstanding of its terms, any want of proof as to the mutual mistake of the contracting parties, no relief has been given.

We find no difficulty in answering the objection made by the defendant's counsel, when he insists no valid insurance can be made by the defendant unless evidenced by a policy issued in due form. We suppose the policy is but evidence of the contract, and can alone furnish a legal right of action; but as in every other case, where the agreement is clearly established, and between the parties mutual engagements are made, we must hold the insurer responsible if there is evidence that a proposition to insure was made, accepted, and the premium fixed. The objection seems to be founded upon a decision of the Supreme Court, 16 Ohio, 148, *Cockerill* v. *Cin. Mut. Ins. Co.,* an opinion we apprehend not strictly applicable to the question before us, and which must not be extended further than the strictest comity on our part may demand. The rule as there announced, is subject to many limitations, and may well be reconciled with the principle we have intimated.

It is a familiar doctrine in equity, that in every case where a contract is sought to be reformed, parol evidence of its terms is admitted, else the agreement must remain as it is written. The reason of the rule applies to all suits for equitable relief. There can be no exception. In the late case, 19 Howard, 318, *Com. Mut. M. Ins. Co.* v. *Union Mut. Ins. Co.,* Curtis, J., very clearly lays down the principle, and sustains his reasoning by a quotation of the American cases. This we regard as the law of the contract between the parties before us.

On the trial of this cause, the testimony offered to prove the alleged mistake was submitted to the jury, the court having directed an issue for the purpose of establishing the facts upon which their judgment in the premises should be formed.

The verdict substantially finds that the plaintiff, when he applied for insurance, fairly stated the purposes for which the building was to be appropriated, that it was occupied as it was afterward proved to be, and that fire-heat was known to be necessary to carry on the business of a candy manufactory.

If there were any doubts as to the certainty of the proof, the finding of the jury has removed them; and the only question for us now to determine is, whether there is satisfactory evidence of another contract than that contained in the policy, existing at the time it issued.

We have no doubt that the plaintiff believed he was insured, as he claims to have been; and the jury have determined that the defendant, through "their authorized agents, were informed of the real condition of the premises." But to give the plaintiff the relief he seeks, this understanding, information, and knowledge, must have taken the shape of an agreement which either party might legally enforce. The preliminaries may have been ascertained, the object known, and the nature of the risk disclosed, yet these elements do not constitute a contract. There must have been an equivalent agreed to be paid for the indemnity about to be furnished. It is well settled that before the premium is paid, or agreed to be paid, or secured to be paid, no liability on the part of the insurer exists; and where no fixed sum is agreed upon, or referred to, and there is no regular specific rate known to the parties that is determined by the nature of the risk, it would seem there could be no valid contract. If, in such a case, the assured should seek to enforce the agreement, what sum must he have tendered, or be able to tender, as premium, in order to perfect his right? Where the parties have agreed upon no such sum,

and its payment is a condition precedent to the liability of the underwriter, can the court determine it? If they could, by what rule are they to be governed? What shall be the limit of their discretion? 1 Sch. & Lef. 22, *Clinan* v. *Cooke;* 14 Ves. 406, *Milnes* v. *Gray;* 2 Wheat. 336, 341, *Colson* v. *Thompson.*

The exercise of such a power would be to transfer the duty of the officers and agents of the insurers to the court, and claim for them the discretion to make a contract *de novo.*

Such, we believe, is not our function. We may reform an agreement so that the parties shall be required to do what they originally intended; but we can create no liability where none originally existed. If there never was any valid contract between the parties, we can not cure the defect by our decree.

In this case, it is not denied that the premium paid was at the lowest rate for a warehouse only. The tenth article of the deed of settlement, to which the plaintiff and defendant were alike parties, forbade the insuring of property to be used or appropriated to the manufacturing of articles requiring fire-heat, unless in special cases, by the consent of the directors, and for an additional premium to be paid.

If, then, we admit all that is proved, and all even that is claimed by the plaintiff, no such premium was ever fixed, or agreed to be paid, and no such assent given to the risk by the directors, as the policy and the deed of settlement required.

We are compelled, very reluctantly, to hold that we can not grant the relief sought by the plaintiff. Before we can reform the contract existing at the time of the loss, we must have satisfactory evidence that there was another valid agreement by which the former can be rectified.

We must be permitted to remark, that though satisfied that there was a mutual misunderstanding between the parties to the policy, and while there is no ground to suppose there has been intentional error, it seems to us that the morality

of the contract would be better vindicated by the voluntary adoption of the understanding of the plaintiff, so clearly proved to the jury, as the basis of the claim to indemnity.

It is not for us, however, to decide a question *ex cathedra*, where we have no right, judicially, to enforce our opinion. We leave the parties as we find them. We decline to give the relief sought by the amended petition, and order a new trial upon the general verdict.

New trial granted.